Good afternoon, my name is Sean Vitrano. I represent Tyzheem Nixon. Excuse me, counsel, I want to make sure you're not disturbing me. Thank you. Can you ask them to please move away from the door? Yes, I think it's quiet now. Thank you, your honor. The district court abused its discretion in rejecting the opinion of a board-certified psychiatrist that Mr. Nixon's criminal conduct was the product of his untreated severe mental health disorder. It procedurally erred when it departed upward 63 months to the range corresponding to the statutory maximum. Its 114-month sentence, which was more than double the top end of the guidelines range, is substantively unreasonable and should be reversed. The court's outright rejection of the expert's opinion and substitution of its own judgment with respect to Mr. Nixon's mental state caused it additionally to improperly conclude that a sentence near the statutory maximum was necessary to incapacitate Mr. Nixon and to promote respect for the law. I will start the discussion with sort of what the content of the expert's report was. There was a substantial volume of information that was presented by defense counsel at the time of the sentencing hearing and slightly in advance of that. But the key piece of this was the report of a forensic psychiatrist, Dr. Utterbach, whose qualifications were before the court. And I'll just briefly summarize what those are. This was a triple board certified physician psychiatrist who had worked in the adult inpatient forensic psychiatric unit at Dorothea Dix Central Regional Hospital since 2007. She had also been in private practice since 2005 as an adult child and adolescent psychiatric physician. She was a fellow of the American Psychiatric Association. And she had been performing psychiatric evaluations and providing treatment plans for 19 years. So her qualifications aren't an issue, are they? Qualifications are not an issue. This is a well-qualified profession. She's there on 702, so you're going to evaluation of her report in terms of the court. You've got this rule here, allows the judge to look at conduct, seems like it's a pretty broad array of things. And I guess the ultimate purpose is there's just some guidelines that you can go up with because you feel there's a need, recidivism, or like to recur because of the seriousness of it. And there's a whole bunch of things that's listed out. A whole list of things under this 4A1.382 that you can do. You don't maintain that list is exhausted, do you? No, I do not. So he can do that. He can look at those lists. And you contend somewhere in your brief that the district court procedure erred by relying on, by considering unreliable information. What's that unreliable information that you consider? Well, the unreliable information that the court considered was its own judgment sort of independent of the psychiatrist's opinion that Mr. Nixon, regarding Mr. Nixon's mental state. I'm trying to be a little careful about not going too far into the diagnoses themselves just for his own privacy. But the district court, what the district court did was just outright reject the report of the expert psychiatrist as to its conclusion. Not necessarily as to the diagnoses that were contained into it. Not a rejection as to the methodology by the psychiatrist. But certainly as to the conclusion that all of this criminal behavior that occurred while he was serving both his state sentence and while he was in the marshal's custody was related directly to that mental illness that he suffered. Now this district court took a lot of care in doing that. I mean, you don't mean to say that if a report says something, a judge cannot go against the report. He has to have some information that supports why he does it. This court, this judge, looks like to me took a lot of care. Went down that list and kind of dealt with that. He says, okay, you say this. He's throwing it in the light. You're an expert. You've got all degrees. You're great at it. You've examined this defendant. But here is experience. Here's what's going on and the inconsistencies of, you know, gave specific examples of how that can happen. I mean, at this stage in terms of the upward departure and what's going on here, that's something the judge can do. I don't think the judge can or should completely disregard the expert opinion that the conduct that the judge is weighing so heavily in formulating its upward departure was the product of a severe untreated mental illness. Let me ask you a question about that. Did the expert interview your client? I thought maybe the expert interviewed your client twice and the second time was before the let's call it like the last two incidents in question and before your client said the thing about, look, it doesn't matter that I brought a shank into the courthouse in my rectum because they can't give me more than 120 months anyway. And the district court thought that seemed somewhat calculating. So the district court had information that the expert didn't have. In terms of the chronology, I think that that's accurate. She did interview him twice. She interviewed him initially at the beginning of November. The sentencing occurred in March and the incident where he made the statement to the marshals where he had the shank was when he was transported to the federal courthouse and that was in February. So yes, in terms of the chronology, that's correct. But it seems important that the district court had access to information and relied on that information that the expert didn't have. Yes, but Ms. Nath, the defense counsel, represented to the court at sentencing that she had reviewed the report again with the expert prior to sentencing and that the expert's opinion had not changed with respect to the findings and the conclusions. So even if there was this new additional information, I don't think the record supports that that necessarily would have supported the district court's view that this defendant was acting in a calculated way or that he was not, for example, in a manic state or suffering from the effect of his disease. So I think what is important to know is what it is that she's characterizing because the district court, in my mind, took a little bit of this out of context when it was simply attributing a calculated mental state saying things like this shows cunning, this is not impulsive behavior. What she described in her report is a severe and persistent mental illness that's both chronic and disabling but that causes changes, severe changes in his mood, energy, urges, and impulses and affects his ability to function. She said that to be able to properly diagnose her, the manic episodes had to meet certain diagnostic criteria. But what she said is that somebody with his condition is at a significantly increased risk for violence, especially when they are not treated. They're prone to agitation that can result in impulsive aggression during manic and mixed episodes. She also said that when the person is experiencing the opposite sort of mood state, that can involve intense dysphoria with agitation and irritability which can also increase the risk of violent behavior. She personally observed him in the midst of a manic episode and she opined more likely than not that his infractions, when she was considering, for example, the 60 infractions that he incurred while he was serving the state sentence, occurred more likely than not as a result of his condition that was untreated. So our review would be abuse of discretion on this point. Even if there is an abuse of discretion regarding the consideration of this report, how does that affect the substantive reasonableness of the sentence? It affects the substantive reasonableness of the sentence because the district court, in explaining the 3553A factors, placed a huge amount of weight on the need to incapacitate Mr. Nixon to protect the public from further crimes. That was the driving factor. The court gave lip service to the other factors, said it had considered them, but repeatedly sat, both in imposing the... And you're saying, absent this expert opinion, not many people would disagree, there's a need to keep this particular defendant in, but you're saying that report calls that into question, or at least something should be weighed. Correct. And I think it was arbitrary for the district court to sort of summarily reject the expert's conclusion. It calls it into question because treatment, there's no need to incapacitate, or there's not the same need that the district court thought to incapacitate because the defendant could obtain treatment. So I thought that defense counsel at trial, and I don't know if that was you or not, but actually put it really well, or at sentencing, and defense counsel said basically, look, the court doesn't have the benefit of knowing where the defendant will be in the future after treatment, and asked the court to take the optimistic approach. And I totally understand that, and I hope that your client benefits from treatment, but I'm not sure that a district court who has to make this predictive call abuses its discretion if it does not, if it takes a more cautious than optimistic approach to that question. I don't think that the court, Your Honor, was taking a necessarily cautious approach. I think the court was convinced that this person presents a 100% likelihood of re-offending no matter what happens. The court didn't consider the mitigating factor that this condition that he suffers from is treatable, that it is... The court did mention, I think, that Mr. Nixon had refused to comply with his treatment regimen when he was on supervised release. I mean, that mattered to the district court. It mattered. Unfortunately, the record doesn't tell us anything about what that treatment was at that point. We know from the record that he was diagnosed right before he was released from the state sentence. I see my time is up. I think the argument is not that the district court erred in the way that it balanced its factors. The argument is that the district court should not have simply excluded, rejected summarily the expert's opinion that the behavior here that it was weighing so heavily in determining that he was at risk of recidivism and needed to be incapacitated for that length of the sentence. It's a faulty foundation upon which the court placed all of its emphasis on that one 3553A factor. It's not that the court said, he's been diagnosed, I accept the diagnosis, I accept that some of the behavior is the result of this condition, but nevertheless, I think that the need for deterrence or incapacitation outweighs that factor. I don't believe the court did that. It understood he has this condition and it can be treated. It said, even if I accept the diagnosis, so we assume that it was at least giving some consideration, and it did, in the judgment, order treatment. The court, of course, didn't tie the length of the sentence that it was imposing to the need for the sentence to provide him with mental health treatment. I know, but I mean, you said, it does seem as though the district court effectively did what you were suggesting, perhaps it hadn't accepted the diagnosis and the fact that it is treatable. I don't think that the court, and again, it's not a weighing issue, I think the court abused its discretion. All right. I think that's my time. Thank you, Mr. Trano. Ms. Halton. Good afternoon, Your Honors. May it please the court, Karen Houghton, Assistant United States Attorney in the Eastern District of North Carolina for the United States. We respectfully request this court to affirm the district court's judgment. Conduct so egregious that it was described as... Before you get into your jury argument, I have a question for you. What about the departure? Wasn't there error in terms of departure, in terms of determining that level three was appropriate? On the 4A1.3A1? In determining that criminal history category three was inappropriate? No, no, before you even get there, you first have to get there first before you... I'm not talking about going up, I'm talking about being at that level there. Isn't there a restriction in terms of what you can use? You can use prior similar adult criminal conduct not resulting in a criminal conviction, but it has to be similar conduct. So what is the conduct that's being compared to be similar to get to that level? The district court relied on the defendant's conduct while he was in custody. He was arrested in December 2020, and between that time and the sentencing in December, in March of 2023, he engaged in three violent assaults of fellow inmates in each instance. And that was similar to what? Well, it's possession of a weapon while he is incarcerated. The crime that he was incarcerated for and ultimately convicted for was felon in possession of a firearm. That's what you compare it to. Well, this was possession of a weapon that he's using to carry out violence, and while he is in custody, he is... This was possession of a firearm. Otherwise, in our Constitution, it's well protected, Second Amendment. The only thing that prevents it is the fact that he's a felon and prohibited, but otherwise it's something that's well protected, better than education. There's no right to an education, but there's a right to carry weapons. So how does that similar conduct? Yes, Your Honor, this defendant had a history of attempted murder in 2013. He shot two people while they were in their house and sent them to the hospital. So he is a felon. Don't you compare it to the offense of which he was convicted of here that caused the incarceration? Yes. You go to the one that's possession of a firearm, wasn't it, and a little bit of marijuana, is that right? Yes. How is that similar under 4A1.3A1? This Court, it is a fundamental principle of the sentencing guidelines that relevant conduct can be brought into the sentencing determination, and so it is not just the elements of the offense. It's not simply did he possess a firearm that is relevant to similar conduct. This Court has held that it is all of the circumstances of his offense. If that's the case, then you're reading out the text. It says it has to be similar. Similar is a limitation. You can use any prior adult criminal conduct not resulting in criminal conviction. These words have to have meaning. I agree, Your Honor. Then tell me how you surmount that in terms of what it says. I just want to hear your argument, because that's what it says. It has to be similar. Possession of a weapon is just possession of a weapon. You could be a nice person, a wonderful person, but you just prohibit it because, at least right now, we're not sure what Bruin might do later, and Rahim in all these cases, and maybe those that come, but at this point now, that's the only... It's not mal, per se. It's mal prohibitive. So being a prohibited person, a felon, in possession of a firearm is very similar to being a prohibited person, an inmate, in possession of an illegal handmade weapon. It shows the defendant's failure to follow the rule imposed that he is not allowed... No, you're in prison. You don't have a right to have a... You can't have a weapon like that. It's just like guns. You can't have it in prohibited places. He was at an airport. He was about to get on a plane. That might be similar, but he's just like an ordinary citizen, other than that we say that you're not protected like other citizens. You can have a gun. As a matter of fact, Bruin said you can take it in the street and have it, and all kinds of things. It's amazing how sometimes we look at guns as well-protected, but other times we get to these criminal statutes that increase people's time in terms of how much time to go in prison, and it's the worst thing in the world, to the fact that we can overcome what it says to be similar. So I'm asking you, how do you get... I'll leave you alone if you don't have... That's the only answer to my question. I understand your argument for why it's similar, but I'm also not... It's not obvious to me it has to be similar, because this is not an exhaustive list. And if anything, the way you would describe what the district court was relying on here, it's not what we usually think of as prior similar adult criminal conduct that didn't result in a conviction. It's more like just post-offense conduct while detained, which also isn't on this list, but everybody agrees, including your colleague, you're allowed to look at that. And so it's not really obvious to me why it should have to be similar, just as a matter of logic. I mean, the district court's reasoning was very much... This is not that the criminal history category underrepresents the seriousness of his history. It's that there is a high likelihood of recidivism, because this person doesn't stop committing crimes even while he is in detention and awaiting sentencing. This seems like the kind of person who's going to commit more crimes. And if that's your reasoning, it's just not obvious to me why you would limit yourself to similar crimes. The point is the crime, not the content of the crime. Agreed. So one... Do you have a case to support that, that you could then use whatever you do in prison? In other words, for example, let's say if you, you know, you... Whatever you did in prison that could be used. You stayed on the yard too long. You stayed, you know, you lifted weights and whatever. I mean, so if we open the door to everything, this would have no meaning. So the threshold question, one way that you can enhance a sentence under Chapter 4 of the guidelines is similar context. Departure. This is not a 3553. This is departure. You get more protection when it's a departure. You agree with that, don't you? Agreed. Under the guidelines, this upward departure, one way that you can upwardly depart is similar conduct. I believe this conduct was very similar. But even if you do not believe it is very similar, there are other ways to enhance the sentence. In U.S. v. Escano, the court said serious dissimilar conduct can also be used if it is serious enough to educate the court on the likelihood of recidivism for that defendant. And so serious similar conduct can be used. Serious dissimilar conduct can be used if it speaks to the likelihood that the defendant will commit other crimes. And that is what the court is looking at here. He has a defendant who was sentenced for attempted murder to 73 to 100 months. He had 60 infractions while in prison. When he gets out and is on probation, he has multiple probation violations, including his failure to comply with mental health treatment and cutting off his ankle monitor. And almost immediately after being released from prison, he engages in this new criminal conduct of possessing a weapon. It was a loaded weapon with an extended magazine that the defendant was reaching for when he was approached by law enforcement. So it is reasonable for this court on these facts to determine that this defendant had as close to 100 percent rate of likelihood of recidivism as possible. The court said this person is very likely to commit other crimes. And therefore, they see upward departure not only... Do you think that a person's behavior in prison in terms of the violence that he has in prison reflects clearly what he might do if he was free? On these facts, you don't have to have a hypothetical because he's shown you... Yes, so even if you discredit the 60 infractions he had in state custody, when he was released, he violated probation, he violated the law again. Again, but these... That's my point. These weren't... Are they similar? Is having a gun similar? I don't know why people who... I'm just really asking you this, really. I'm serious about it. Because I'm reading the Supreme Court cases that it's so important that you have a gun to protect yourself. Why shouldn't a person who's post-incarceration... They don't need protection? In their home, they can't have a gun? I mean, to me, it's just inconsistent. You've done your time, you've paid society, and you get out sober. We don't care what happens to you. Everybody else can have protection in their home. You can't. How does that make sense? Because it's such a right that's so important to us in this country. And the Supreme Court has told us that we have to use even historical analogs to even find out whether or not we can prohibit, right? So why should those people be bereft of protection like anybody else? They want to be good citizens, like us, right? Don't you want them to be good citizens when they come out? And good citizens ought to have constitutional protections, right? We would like everybody who comes out of prison to have constitutional protections and be good citizens. Except for those who have shown by their prior conduct that they are dangerous and they have a history of violence. This is somebody here who committed attempted murder. He was punished for that? Until the law in this country changes, somebody who is convicted of a violent felony is prohibited from having a gun once he is released from prison. And that is the state of the law. And on these facts, one can understand why that law is in place given the level of dangerousness that this defendant has shown. I feel like the district court was very much focused on the part where with the smuggling of the shank into the federal building. And I mean, I don't understand the defendant to be arguing, I felt I needed protection in the federal building. I think he said that was not his plan for the shank to protect himself. And so I am, I don't know exactly what my question is, except that he does indeed seem fairly dangerous. And in fact, he said the reason for smuggling in the shank was to use against people like the U.S. Deputy Marshal, who was the one who recovered the weapon. So, I mean, he is threatening law enforcement with that weapon, not protection. I feel like the district court was primarily focused on this, almost like not so much the possession of the firearm illegally as a felon and more on the intent to do violence with the shank in the courthouse or federal building, I should say. Yes. And this is a defendant who has repeatedly shown that when he is given a weapon, he will carry out violence, not only in the streets, but also while he is incarcerated. I will leave this alone, but the difference is, we can't, I am not arguing in terms of having a shank dangerous, that aspect of it. The limiting aspect of it is normally criminal history is for what your convictions have been. But it goes further, if you are an adult, you can use prior. But the restriction is that it should be similar. Now, if you did something before that is very dangerous, like shank and all of those things, that is dangerous. But it has to be something that is similar in a sense. We are talking about having the gun in terms of similar activities. So you are saying you can compare it to anything that you do post and everything, but you don't compare it to what his violations were. Because that is what convictions were, right? Monitor and having a weapon and those things like that. You say that having a weapon is per se dangerous. My position is that the conviction of offense that he was convicted for, the possession of a weapon by a felon, is similar to the conduct that he exhibited while in prison. But even if you can't get past that. Isn't it dangerousness that you are making it similar? Because he didn't hurt anyone with the gun, right? He didn't attack anyone, correct? He was reaching for it. But you are comparing, see cases like this are difficult only because the facts are such, but that is what makes the law beautiful in terms of justice. You still have to try to follow the law even though you find what may be overall disgusting. But those are people who need protection. People who do what you want them to do don't need the Sixth Amendment. They don't need that. But here it seems to be tentative, but I will leave it alone. Let's go to the incremental. The District Court judge said I will do this incrementally, but then he jumped from three to basically six. I didn't see anything where he stopped at four or five. I am speaking to you, so you are okay.  The District Court acknowledged that under the sentencing guidelines and this circuit's precedent that he needed to move incrementally across criminal history categories, and then if he got to level six and still found that range to be insufficient, and he said that is what I find here, then he moved up in offense levels until he found a range that was sufficient but not greater than necessary to effectuate the purposes of sentencing. He said he knew he had that duty, acknowledged he was following that, and then he gave a reasoned discussion for the extent of his departure and why that was the appropriate range. He said that he incrementally went from three to four or four to five. This court has said you don't have to go from three to four, that's insufficient. Four to five, that's still insufficient. Five to six, that's still insufficient. It is reasonable for the District Court to move to category six, say that is still insufficient, and then to move up. Incremental means nothing. Incremental means a slow approach. He's not just jumping to whatever category he wants. He's recognizing it is a reasoned approach to keep the sentencing range sufficient but not greater than necessary, and the District Court is doing that here. That's not incremental. Maybe I'm misunderstanding what that means. Incremental. What does incremental mean? Moving level by level. Thank you. Where's the evidence that he moved level to level? His acknowledgment that that was his obligation. He said that. Saying that that's what he was doing and then providing a reasoned analysis for why he found one. I'm not saying the District Court did, but I'm just saying what it means. It's sad, but incremental ought to be something that's tangible in our record. Don't you think? Yes, and this court has been very clear though that it does not require every single level to be given lip service that that one is insufficient. That it is reasonable for a judge to move incrementally and say those categories were insufficient. This judge said category 3 is woefully insufficient. He went up in categories and found category 6 still insufficient. There is a reasonable analysis that the categories in between were insufficient without him explicitly saying that. And this court's precedent has been clear that you don't have to address each and every category as long as you have a reasoned analysis that this court can review of why you reached the range that you did. And here the court gives a very thorough explanation of why it departed up to the category it did. One of those being the significant likelihood of recidivism for this defendant. He was sentenced on a state charge to 73 to 100 months and that in no way deterred his criminal conduct. So for the District Court to go to a sentence higher than his state sentence is entirely reasonable to have any deterrent effect on this defendant at all. The District Court also talked about the need to protect the public from this individual and the dangerousness. So the reasoning for being at a sentence of 114 months is clearly discernible from the record and that is what this court requires to move incrementally to find a sufficient but not greater than necessary range and to justify that. What about going from level 20 to 24 after you already had 6? Yes, Your Honor. So the District Court found category 3, category 6 still insufficient and moved up in offense levels. That is what this court has advised the District Courts to do in order to continue to move incrementally and find a range that is sufficient. And the District Court did that here to find a range and ultimately a sentence of 114 months. So in other words, there was no end there. He could have gone as far as he wanted to, right? Well, there is a maximum sentence from the statute. So there is eventually an end. I thought Congress meant to give some protection along the way. Just saying, when the road ends, I guess you have to stop walking because there is no more road. I thought justice was a little better than that. Can I ask you a question? The District Court did this as a departure, which does require all of this analysis. And it just seems sort of, and then he says, I also would have done it as a variance. And it just seems like some of this, this all would have made so much more sense pre-Booker. If you wanted to give a different sentence, you kind of needed to jam it into this departure thing. And now a District Court can just say, whatever the guidelines are, I will vary to the degree I have to to get to this sentence. And I guess the reason, I just want to make sure I understand why post-Booker it even this is a guideline sentence. So when we review it for substantive reasonableness, it would be presumptively valid. If it is a variance, it is not presumptively valid. Is that why it matters which one we are under? So I think this Court has the ability to find substantive reasonableness under either the variance or the other departure. Presumptively, and one would not be, I'm just trying to figure out why are we all doing this given that the District Court also said, well that's wrong. Same sentence and now it's a variance. And the reason we're not just jumping right to that is because then that would be an outside guideline sentence. Whereas this one, if the District Court was right about this, this is a within guideline sentence. And it would be presumptively reasonable substantively. I'm probably asking the question wrong. Why does it matter whether this is a variance sentence or a departure sentence? This Circuit has said it doesn't matter. On appellate review, if this Court can find one of those, either the upward departure or the variance substantively reasonable, then it can uphold the entire sentence. But am I right that if the District Court appropriately departed, then this would be a within guideline sentence. So when we review it for substantive reasonableness, we would start from a presumption that it's reasonable. If the District Court was wrong and this was a variance, then this would be a quite dramatically outside guideline sentence and we would take that into account when we reviewed it for substantive reasonableness. I'm not entirely sure, but I believe that even on the departure it is still outside of the guidelines and would need to be If it's a departure, then what was the point of departing? I thought that if it's a departure, the range was 100 to 120 months and this is a 114 month sentence. Is that not right? That is right. That is correct. So it's within guidelines. If this was an appropriate departure, this is a within guideline sentence. Yes. Although the extent of the departure, so it's not just did he follow the incremental approach, but also does the extent of that departure reaching that category, is that justified? And that is a substantive reasonableness analysis similar to what would be undertaken under the variance as well. So to briefly conclude, this Court has Well, the belt and suspenders approach is If departure is wrong, then I do a variance. I call it belt and suspenders. So what about the report from the expert, which was not counted by the government at all, and in terms of the diagnosis of bipolar, which I think with any DSM diagnosis, I think most people would agree in terms of the sciences, that bipolar is effectively treated by keeping the correct therapeutic levels of medication. As a matter of fact, in this case, wasn't there some evidence for three months there was a drastic change in his behavior when he was, right? Isn't there evidence in that, right, in this case? So how did you just offhand just reject that? Because when a person is in a manic state, you know, I used to practice criminal defense law and many other types of law, but believe me, when you get that chemical balance off, and you go into manic, I've seen people who are in cases where people are like less than five feet tall and handle some people who are really bigger than they are in that manic state, but that's why you had to do the blood work periodically to make sure they're chemically and therapeutically treated. You see, because one's mind is the only thing that they have. That's what separates us from animals. And if your mind has to be clear, if you're suffering from a mental illness, which in this record, that is unrebutted. Not accepted by the district court, but unrebutted in the record. And then why does that not factor in the fact that this person might be a better person now that we know now what his condition is, and we know now by science how he can be treated, than to say this person is going to be a monster and a danger for the rest of his life when we know there's a way to treat them. How does that discount it completely, categorically? That's my question to you. There was a lot in that question, so I will start with your assertion that the government didn't rebut the expert opinion. I'm sorry, I'm sorry. Y'all had an expert? I'm sorry? You had an expert? No, Your Honor, but the government does not need to present a counter-expert in order to rebut an expert opinion. How do you rebut a bipolar diagnosis? In two ways. First, the government questioned the methodology that was employed to reach the conclusions in the report. So the government said this report was written based on two telephone sessions with the defendant. Both of those occurred before much of the misconduct that was at issue at sentencing even happened. The report appeared to not include... So let me make sure I understand that. You questioned the methodology of an expert that had been admitted. I take it she was admitted as an expert? Yes, the report was accepted. So she meets the evidentiary standard under 702 to be admitted as an expert, which questions, at that point, the reliability, the admissibility of it. And at that point, you say the government still can, on the merits of it, question the methodology that's used? I think the methodology that is used, if there are potential flaws in it, can go to the validity of the opinions that are expressed in the report. They can do that without a lay opinion, a lawyer, there's no training whatsoever as an expert, can then question the methodology of an expert if you don't have an expert? Cross-examination of an expert typically involves questions regarding how did you do this report, how many times did you talk to the defendant, what were those dates, why didn't you ask him about these disciplinary infractions. So it is proper questioning of an expert, and here the government made those an argument that there appeared to be some flaws in the report that the court should consider, which would maybe give less weight to the opinions that were expressed. You mean the facts that she relied upon to form the basis of the opinion. You don't mean the method she used, do you? You mean the facts that the expert relied on could be inaccurate through cross-examination? Yes. For a method as a psychiatrist, you don't have the authority or expertise to question that, do you? Well, the government raised potential flaws in the report, and so that was one form of attack. The second way that the government rebutted the expert opinion was not the report in total. It was one opinion that was expressed in the report that specifically related to his conduct, to the disciplinary action, the misconduct that happened while he was in custody. And the expert gave an opinion that his disciplinary infractions were the result more likely than not because of his mental health disorder, and so that was a specific finding that was rebutted by the government's evidence of the facts and circumstances surrounding those specific events. So the government put on witnesses, had photographs, evidence of exactly what happened while he was in custody, and when the court looked at that and tested it against this opinion from the expert, saying it was caused by his disorder, the court found that that didn't line up and that the type of impulsive aggression that would be outside of somebody's control didn't fit with the facts and circumstances of many of these offenses that the defendant engaged in while in custody. And so the government presented rebuttal evidence to an opinion as to his specific conduct while in custody. And that does not mean that the court discounted his diagnosis overall or rebutted that this was a serious issue. It just said that that opinion is inconsistent with the other evidence about what happened while he is in custody. See, that's the problem. What you have is that the evidence of what happened was violence, right? He participated in some very violent acts, correct? That was one fact. There's violence. There's the statements he made. There's how he got involved in the violence, running up the stairs. There's how he had a weapon with him in each one of these instances. There's his attempts to hide the weapon, to lie to law enforcement about it. So there's a lot of different facts and circumstances that were presented. See, that's the problem, that people who have bipolar can be high-functioning intellectually. It's almost like you're saying, it's like, okay, you're manic, like you can't think. And when you're in a manic state, it's like someone who, you know, for example, is angry. An angry person can buy a plane ticket, get on the plane, and go and kill someone. And that's all in a manic sense. But it doesn't mean that those things along the way are inconsistent with being manic. I mean, you think that somebody's just slurring at the mouth and eyes bulging and things, that's the only manic aspect of it. It's not being able to control your emotion at that high level as opposed to being at the other end of the pole, depression. You know, so those kind of things are what experts do. And your questions are not evidence. The government's questions are not evidence at all. They're just questions. The only expert, the only testimony, sworn testimony was the expert. And the only thing that the expert said about the disciplinary infractions, which was a key feature at the sentencing hearing, was that they were caused more likely than not by his diagnosis. There was no facts presented by the expert of whether he was in a manic state or he was in a tranquil state. Not all violence carried out by somebody with a mental health disorder is caused by that mental health disorder. People carry out violence. I'm going to leave you alone, but there's one thing. When a medical professional testifies, it's basically this. Within a reasonable medical certainty, it is my opinion that that diagnosis would cause that behavior. That's the testimony. It's not a matter of whether I thought about every little piece of that. As described to me, what he did is, in my medical opinion and judgment, that his diagnosis, that was the cause. That's what the testimony was. That's the expert testimony. And it's the only witnesses that basically give opinion. And there's nothing in this record that called into question the ability for that witness to make that medical diagnosis and opinion about that. So the point is that it's not a matter of excusing it, but you just ignore that completely. That's the thing, that this is a person who has a treatable mental illness. And that ought to at least factor that you balance that and say, well, I understand that. But to say that this person will always be like they have been in light of that diagnosis, that seems problematic and a problem because that's the whole idea of these sentencing. It's like people do it all the time when they say, well, you killed somebody. Well, we look at this thing at certain levels, and people say, oh, go back years later, well, I was under some pressure, and that was causing maybe you get out of prison. Other people don't. I don't know. Maybe you assume that you're going to have that kind of activity. Other people say, oh, you had a problem. Now we know. You know, it happened when he was, I don't know, whatever. But then other people are like, oh, bipolar, you'll never be anything other than a monster. That's what I'm talking about. I'm not talking whether you excuse the behavior. It's that now we know, and there's nothing against that. Anyway, I hear your argument. I'm finished with you. But I think these cases are a lot more important and deeper than people see it because I think that's kind of what happens in terms of the difference people are treated and how their problems are not addressed. Other people, they go off and get a psychiatrist and whatever and come back and, okay, well, that's fine. We'll understand. Maybe they're out in six months or whatever, and other people are in forever. May I briefly respond to that? No, I don't think you have a response. But if you do, go ahead. Just one thing to point out is that this defendant was treated for anxiety, depression, and bipolar disorder shortly before he was released from his state imprisonment. He was given medication, and he was released, and he failed to comply with his mental health treatment. So this was a defendant who was given access to the exact treatment. He is now saying, if you give me that treatment, I will no longer be a danger. Well, he was given that treatment, and he was still a large danger to society. And how long was he given the treatment? So the medical records are not entirely clear, but at least three months before he was released from the state sentence, he was given that medication. And then, as you pointed out earlier, there is a follow-up report saying he hasn't had any infractions since then. Right. But then he is released, and he no longer complies with his mental health treatment, and he engages in new criminal conduct and a variety of other probation violations. So he was given the exact chance he is asking for here, give me a more lenient sentence because I'll be treated and I won't be dangerous. Again, you have to have an understanding of the science. You're absolutely right. When you're diagnosed as bipolar and you get the regimen, they do resist that because they don't like the way it makes them feel. It's a liturgy and those kind of things. It takes a while to get people to maintain their therapeutic levels. It's like, okay, we gave him three months to do that. Okay, we won't do that anymore. It takes a while. It's like anybody else. You have a heart problem. They tell you you've got to get rid of your cholesterol. You go off and eat donuts and everybody says, well, let's stop giving them medicine because they will eat donuts. No, because that's what humans do. We live in the vicissitudes of the nuances of the human experience. And most of what you and I are discussing today was discussed in the district court. No, it wasn't. Was it? That was a rejection? A lot of what was discussed back and forth. You read a different record than I did in terms of the bipolar. What did you say, counsel? I'm sorry? Go ahead. Finish what you were about to say. I was just going to say because there was a substantive discussion of his mental health issues, of all the mitigating factors, and the court weighed it differently than the defendant, we ask you to affirm the decision. Oh, thank you, counsel. Appreciate it.  Mr. Vitale, you have a few seconds left. I don't think there was a weighing. Judge Gregory, I think you hit the nail on the head. I didn't see it either in the record. It's a rejection. The kinds of things that the government was saying at sentencing to try to rebut what was in the expert's report were their own diagnoses. For example, at one point, Mr. Severo says, quote, there are other certain personality disorders that this defendant, I would contend to the court, would probably qualify just as likely. And he goes on to describe antisocial personality disorder and the characteristics of that. Says things like this is somebody who's potentially a malingerer or this is just a mindset issue where he's manipulating his statements to try to justify the conduct. I don't think that remotely rebuts the information that was contained in Dr. Utterbach's report. But it's not just Dr. Utterbach's report. The record that the defense counsel provided here was much more full than that. She obtained CPS records showing that this person was suffering from these symptoms, wasn't properly diagnosed as a child, went into a high school where it was essentially a confinement situation. Repeatedly throughout the state sentence where he's incurring 60 infractions that we really know very little about is begging for help. And then finally, you know, in September before he gets released in November from that long sentence, they finally put him on two mood stabilizers and they've got it in such a controlled fashion where in the two months after that he doesn't incur any more infractions. So there is plenty of evidence to support in this record, you know, sort of what is contained. It bolsters what's in Dr. Utterbach's report. And I think the district court just can't simply ignore that. What if the report had been from a neurosurgeon that said, I took a scan of the defendant's brain and I see that there's a tumor pressing on a part of his brain that is sort of affecting his judgment and his ability to control his behavior. Is the district court entitled to simply say, nope, I don't credit that? That's what the district court has done here. And this court has sort of found that this is a pattern for the district court. That's why I cited higher in my 28J letter. You know, if the court is ignoring all of this evidence in higher, the court determined that that was a clear error. Here, again, it's the faulty foundation upon which the court concluded that this person was irredeemable and we needed to warehouse him for close to the statutory maximum. Thank you, Counselor. Thank you. Mr. Vetrano, I note that you're a court opponent. And I want to tell you that on behalf of the Fourth Circuit, we thank you for your service. We depend on lawyers like yourselves who come here and handle these cases. Sometimes they're difficult cases and it means a lot as a counselor. I want you to know that we appreciate that and count it very highly. And Ms. Horton, of course, your able representation of the United States is also noted. We'll come back to you, Counselor, after we adjourn the court for tomorrow morning. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: Roger L. Gregory, James Andrew Wynn, Pamela A. Harris